KRUPANSKY, J., delivered the opinion of the court, in which BOGGS, J., joined. CLAY, J. (pp. 361-63), delivered a separate opinion concurring in part and dissenting in part.
OPINION
KRUPANSKY, Circuit Judge.
The plaintiffs-appellants Royal E. Claybrook Jr. (“Royal Jr.”), Gwannette Claybrook (“Gwannette”), Petrece Clay-brook (“Petrece”), and Quintana Claybrook (“Quintana”) have disputed the district court’s dismissal of their complaint for failure to state a claim, and/or its award of summary judgment to the defendants,[1] against the defendants-appellees Jesse Birchwell (“Birchwell”), Steve Lewis (“Lewis”), Ken Spencer (“Spencer”), Robert Kirchner (“Kirchner”), and the Metropolitan Government of Nashville and Davidson County, Tennessee (“Nashville”). The plaintiffs have alleged that peace officers Birchwell, Lewis, and Spencer used excessive force, in violation of 42 U.S.C. § 1983,[2] which resulted in the death of Royal Claybrook Sr. (“Claybrook”) and the serious bodily injury of Quintana Clay-brook. They further contended that Kirchner, as the Chief Executive Officer of the Nashville-Davidson County Metropolitan Police Department, failed to properly train and/or supervise the three faulted field officers, and neglected to develop appropriate official departmental guidelines restraining the unjustifiable utilization of lethal force. The trial court concluded that (1) Royal Jr., Gwannette, and Petrece Claybrook (the children of Royal Sr.) lacked standing to recover for alleged personal losses derivatively generated by their father’s violent demise, and had failed to seek recovery for Claybrook’s alleged constitutional injuries as representa *354 tives oft his estate; and (2) Quintana had suffered no cognizable constitutional tort.
On the evening of February 28, 1995, plainclothes Caucasian undercover police officers Birchwell, Lewis, and Spencer of the Nashville Crime Suppression Unit were engaged in anti-crime surveillance, from an unmarked squad vehicle, in a high-crime Nashville neighborhood. At approximately 9:11 p.m., they observed an African-American male (later identified as Royal Claybrook Sr.) standing near the street curb in the dimly-lit parking lot of the F & J Market (“the market”) while displaying a long gun at port-arms. A gray Maxima automobile blocked the business’ entrance. The patrolmen knew that the market had been the target of recent crimes. Suspecting that a robbery was in progress, the driver of the incognito patrol car, Officer Birchwell, in conformity with his department’s standard operating procedures, radioed the police force headquarters to report the gunman’s location and to request the immediate dispatch of a marked police cruiser containing uniformed law enforcers.
Birchwell then drove the undercover vehicle into the market’s parking lot. He intended to stop his vehicle on what appeared to be a driveway or alleyway which abutted the building’s western side, to enable the officers to surreptitiously observe the firearm-toting suspect and the suspicious gray automobile, pending arrival of the summoned marked squad car. However, Birchwell subsequently discovered that no contiguous roadway paralleled the structure’s west end. Consequently, while repositioning his vehicle to prevent the armed suspect from facing the officers’ backs, Birchwell maneuvered the unidentified patrol car towards the stationary gray automobile.
That movement prompted the wary gunman to advance menacingly behind the hood of the gray Maxima while facing the intruders. Unbeknownst to the peace officers, Claybrook’s daughter-in-law, Quinta-na Claybrook, worked at the market. Because that establishment served as a “front” for an unlawful “numbers” gambling operation, thieves occasionally targeted it. Quintana was responsible for depositing illegal betting proceeds. The associated physical danger prompted Clay-brook habitually to escort Quintana, while armed, from the store to her automobile. He customarily remained in the parking lot, holding his shotgun in plain view, until Quintana had exited the area. Claybrook was acting as a. security guard for his daughter-in-law on the evening of February 28, 1995. When the unmarked police vehicle arrived at the scene, Quintana was already inside the Maxima, seated behind the steering wheel with her back towards the three defendant peace constables, although each of them testified that he did not know that anyone then occupied that automobile.
Quintana testified that a passenger within the strange vehicle (the unmarked police car) ordered Claybrook to drop his weapon, to which he responded, “no, you drop your gun.” She further attested:
And then the next thing I know, I heard like a firecracker sound, and then I felt something in my back, and I kind of jumped, like, you know. And I really didn’t know what had happened, because, you know, I hadn’t heard a gun shot, you know, before.
And then I kind of felt like I was wet, and so I kind of felt, and I was like, you know, — and then I realized that I had been shot. And I kind of leaned over in the seat, and I looked up at my father-in-law, and he looked at me. He was still standing in front of my car.
And then I just — you know, I saw like — I guess it was a burst of fire or something. I don’t know what it was. It was just like some fire or something. And I heard a big boom. And then I just heard a whole bunch of just fireworks and, you know. And then I heard *355 another boom.[3] And I was like, we’re getting robbed. Somebody’s robbing us.
Tragically, Quintana’s back had been struck by a stray bullet. She testified that she unsuccessfully attempted to telephone “911” on her cellular phone. She then called her husband, Royal Jr., to report that armed assailants were attempting to rob her and Claybrook. However, because she crouched inside her vehicle following the initial volley, she did not witness the shoot-out.
During much of the ensuing fírefíght, Claybrook shielded himself behind the Maxima. Rounds discharged by Clay-brook struck the windshield, hood, and door of the officers’ cruiser. The three police officers testified, contrary to Quinta-na’s assertion, that Claybrook discharged his firearm at least twice before they were able to return the assailant’s fire. They further asserted that, following the initial exchange of gunfire, they endeavored to identify themselves as police officers by verbalizations reinforced by manual displays of their official badges which each wore on a neck chain. Nevertheless, Clay-brook continued to shoot at them. Officer Birchwell sustained gunshot wounds to his right thigh and knee and left foot. He then reported to the police dispatcher, via radio, that shots had been fired, and again requested immediate back-up assistance. At approximately that time, the suspected perpetrator fled behind the market. However, apparently rejecting the available option of escaping unharmed by means of an adjacent street, Claybrook circumambulat-ed the structure in a bid to ambush the agents from the rear.
Claybrook concealed himself behind a slightly elevated concrete structure which afforded a dominant strategic firing posture. Each of the three officers testified that they once again warned the assailant to drop his weapon. Instead, he aimed his shotgun directly at them. The officers defensively fired at the suspect, bringing him to the ground. Approximately at that same moment, marked police units transporting uniformed officers, as well as an ambulance containing emergency medical technicians (“EMTs”), arrived at the scene. The entire incident had transpired within only one or two minutes.
Claybrook, pronounced dead at the scene, had sustained a mortal head wound. Upon discovering the seriously injured Quintana inside the Maxima, the EMTs rushed her to Vanderbilt University Hospital, where she received emergency medical attention and subsequent extended hospitalization.
On February 12, 1996, the plaintiffs instigated a complaint in district court under section 1983 and Tennessee law. Count one asserted that Royal Jr., Gwannette, and Petrece Claybrook, as the “heirs at law” of their deceased father, suffered injuries consequent to the three defendant officers’ alleged violations of their parent’s civil rights. Via Count two, Claybrook’s three children sought recovery from Robert Kirchner, the Chief Executive Officer of the Nashvüle-Davidson County Metropolitan Police Department,[4] for his alleged failure to (1) properly train and/or supervise the three police officer defendants and/or (2) implement adequate departmental policies circumscribing the application of deadly force. Count three advanced the claims of Quintana and her husband Royal *356 Jr. for the officers’ averred infringements of Quintana’s civil rights. Count four articulated Quintana’s claim against Kirchner anchored in allegations similar to those stated in count two. Count five, asserted by all plaintiffs, alleged that Birchwell, Lewis, and Spencer had committed state law torts.[5]
Each of Claybrook’s three children requested $125,000 in actual damages, plus an equivalent sum in punitive damages, against each defendant. Quintana sought $250,000 in compensatory damages for her personal injuries, plus an equivalent amount of punitives, against each defendant. The plaintiffs further petitioned for an award of attorney fees under 42 U.S.C. § 1988(b), an equitable declaration that the Nashville police had violated their civil rights, and an injunction compelling reform of the Nashville police department’s deadly force policies.
Following the lodging of the defendants’ answers to the initial complaint, the plaintiffs, on May 23, 1996, filed a four-count amended complaint which reiterated, with modifications, causes one through four of their original complaint. However, the plaintiffs added, inter alia, language to their complaint intended to clarify that Royal Jr., Gwannette, and Petrece Clay-brook did not seek satisfaction for alleged losses personal to themselves; rather, they were prosecuting the instant action, as representatives of the decedent’s estate, for compensation of Claybrook’s pre-death constitutional deprivations. The caption of the amended complaint listed the plaintiffs as:
ROYAL E. CLAYBROOK, JR., GWAN-NETTE CLAYBROOK, PETRECE CLAYBROOK, CO-ADMINISTRATORS OF THE ESTATE OF ROYAL E. CLAYBROOK, SR., AND QUINTA-NA CLAYBROOKU
(Boldface added).
The two counts advanced by Claybrook’s three children related:
COUNT ONE
33. On the basis of the allegations in paragraphs 1 through 32 [generally averring the plaintiffs’ version of the events of February 28,1995], defendants Birchwell, Lewis and Spencer are liable, both jointly and severally, to plaintiffs Royal E. Claybrook, Jr., Gwannette Claybrook and Petrece Claybrook, the heirs at law of Royal E. Claybrook, Sr., for the defendants’ conduct, individually and in concert, to violate the civil rights of Royal E. Claybrook, Sr. under the First, Second, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution. These rights include the right to be free from unlawful arrest and from unreasonable and excessive use of police force, to freedom of movement, to keep and bear arms, to be free from cruel and unusual punishment, to due process of law and to equal protection of law.
COUNT TWO
34. On the basis of the allegations in paragraphs 1 through 32, defendant Robert Kirchner is liable to plaintiffs Royal E. Claybrook, Jr., Gwannette Claybrook and Petrece Claybrook, the heirs at law of Royal E. Claybrook, Sr., for his failure to develop policies and procedures, to properly train police conduct [sic] in undercover activities, to train with regard to the use of deadly force and to supervise and regulate adequately so as to protect Royal E. Clay-brook, Sr. and to prevent the violations of the said Claybrook Sr.’s rights as alleged in paragraph 30 [paragraph 33?] above.
Additionally, the amended complaint alleged (1) the parent-child relationship of Claybrook to Royal Jr., Gwannette, and *357 Petrece (paragraphs one through four); (2) that “Plaintiffs Royal, Gwannette and Petrece Claybrook are co-administrators of the Estate of Royal E. Claybrook, Sr.” (paragraph six); and (3) that “[a]s a result of the wrongful acts of the defendants, plaintiffs Royal E. Claybrook, Jr., Gwan-nette Claybrook and Petrece Claybrook incurred medical and funeral expenses, as well as great emotional loss associated with the wrongful death of their father.” (paragraph thirty-one). Furthermore, the plaintiffs’ Prayer for Relief sought personal compensatory and punitive damage awards for each of them, as well as collective equitable relief, in conformity with their original complaint’s prayer; but it did not expressly request any relief for the Estate of Royal E. Claybrook, Sr..
Following discovery, the district court, on July 1, 1998, granted the defendants’ motions for dismissal of the amended complaint and/or summary judgment. The plaintiffs noticed a timely appeal on July 20,1998.
In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort. Jaco v. Bloechle, 739 F.2d 239, 241 (6th Cir.1984). See also Purnell v. City of Akron, 925 F.2d 941, 948-49 n. 6 (6th Cir.1991); May v. County of Trumbull, 127 F.3d 1102 (Table), 1997 WL 651662, at *4 (6th Cir. Oct.20, 1997) (per curiam); Tinch v. City of Dayton, 77 F.3d 483 (Table), 1996 WL 77445, at *1 (6th Cir. Feb.20, 1996) (per curiam). Accordingly, only the purported victim, or his estate’s representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim’s family members. Id. Despite the amended’ complaint’s caption, which named plaintiffs Royal Jr., Gwannette, and Petrece as co-administrators of Claybrook’s estate, coupled with an express allegation at paragraph six to that same effect, the district court construed counts one and two as seeking only compensation for alleged personal losses and suffering experienced individually by Claybrook’s three children. Consequently, the district court dismissed counts one and two because the plaintiffs lacked standing to initiate personal claims stemming from alleged violations of their deceased father’s federally protected liberties.[6]
Upon de novo review of a trial court’s dismissal of a complaint under Rule 12(b)(6), the allegations of the complaint should be construed liberally in the plaintiffs’ favor. Lewis v. ACB Business Services, Inc., 135 F.3d 389, 405 (6th Cir.1998). “[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added; note omitted). In this case, the lower court dismissed counts one and two on the sole rationale that the plaintiffs had failed to plead that they sought damages as representatives of their deceased father’s estate for his alleged constitutional injuries. However, plenary scrutiny of the material allegations of the amended complaint reveals that, when construed in the light most favorable for the plaintiffs, they have adequately requested compensation for Claybrook’s alleged constitutional injuries in their representative capacities as co-administrators of his estate.
Notwithstanding that certain allegations of the amended complaint also appear to aver that Claybrook’s children suffered personal losses caused by the defendants’ alleged impingements of their decedent’s constitutionally safeguarded interests, which created some ambiguity regarding *358 the identity of the person(s) whose injuries in fact were asserted in counts one and two, this reviewing forum regards those extraneous allegations to constitute mere surplusage which ultimately have no substantive effect. Because the plaintiffs have unequivocally alleged in plain language that they have prosecuted the subject action as the co-administrators of Claybrook’s estate, matched with clear allegations in counts one and two that the defendants’ actions had deprived Clay-brook of his civil rights, it cannot be said that they have pleaded no set of facts in counts one and two which could conceivably entitle them, as representatives of Claybrook’s estate, to relief. Accordingly, the district court’s dismissal of counts one and two for failure to state a claim, which was justified solely on the rationale that the plaintiffs had not pled that they sought recovery for their late parent’s injuries as representatives of his estate, constituted legal error. Hence, the Rule 12(b)(6) dismissals of counts one and two are reversed, and the case remanded to the district court for further proceedings regarding those causes of action as are consistent with this decision.[7]
By contrast, the district court correctly resolved that counts three and four of the amended complaint were not supported by sufficient evidence.[8] Those causes of action recited:
COUNT THREE
35. On the basis of the allegations in paragraphs 1 through 32, defendants Birchwell, Lewis and Spencer are liable, both jointly and severally, to plaintiff Quintana Claybrook for the defendants’ conduct, individually and in concert, to violate the civil rights of Quintana Claybrook under the First, Second, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. These rights include the right to be free from unlawful arrest - and from unreasonable and excessive use of police force, to freedom of movement, to keep and bear arms, to be free from cruel and unusual punishment, to due process of law and to equal protection of law. Said defendants are liable to plaintiff Royal E. Claybrook, Jr. for the loss of companionship, love and affection of his wife, Quintana Claybrook.[9]
COUNT FOUR
36. On the basis of the allegations in paragraphs 1 through 32, defendant Robert Kirchner is liable to plaintiff Quintana Claybrook for his failure to develop policies and procedures, to properly train police conduct [sic] in undercover activities, to train with regard to the use of deadly force and to supervise and regulate adequately so as to protect Quintana Claybrook and *359 to prevent the violations of the said Quintana Claybrook’s rights as alleged in paragraph 32 [paragraph 35?] above.
On review, Quintana has disputed only the trial court’s dismissal of her Fourteenth Amendment substantive due process claim.[10] Ordinarily, a charge that law enforcement personnel used excessive force to effect a plaintiffs arrest, which caused bodily injury to that individual, is assessed under Fourth Amendment “objective reasonableness” standards.[11] Graham v. Connor, 490 U.S. 386, 394-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Tennessee v. Garner, 471 U.S. 1, 7-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Accordingly, when an arrestee is “seized” by means of deadly force, any dependent section 1983 claim initiated by the target, or his or her estate, must be supported by proof that, under the pertinent circumstances, the means used to detain the suspect were objectively “unreasonable.” Id. However, the Fourth Amendment “reasonableness” standard does not apply to section 1983 claims which seek remuneration for physical injuries inadvertently inflicted upon an innocent third party by police officers’ use of force while attempting to seize a perpetrator, because the authorities could not “seize” any person other than one who was a deliberate object of their exertion of force. Brower v. County of Inyo, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Rather, constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official “seizure” are adjudged according to substantive due process norms. County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 1714-16, 140 L.Ed.2d 1043 (1998).
Fundamentally, the substantive component of the due process clause insulates citizens against the arbitrary exercise of governmental power. Id. at 1716. Accordingly, conduct of a law enforcement officer towards a citizen which “shocks the conscience” denies the victim fundamental substantive due process. Id. at 1717. In situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action (such as, for example, most occasions whereby corrections officials ignore an inmate’s serious medical needs), their actions will be deemed conscience-shocking if they were taken with “deliberate indifference” towards the plaintiffs federally protected rights. Id. at 1719. In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation (such as, for example, a prison riot), public servants’ reflexive actions “shock the conscience” only if they involved force employed “maliciously and sadistically for the very purpose of causing harm” rather than “in a good faith effort to maintain or restore discipline^]”[12] Id. at 1720 (citation omitted).
*360 Applying those principles, the Lewis Court analogized a high-speed motorcycle chase, which led to the accidental death of the pursued motorbike’s innocent passenger, prompted by “unforeseen circumstances [which] demanded] an officer’s instant judgment,” to a prison riot. Id. Thus, the more exacting “malicious or sadistic” standard of proof, rather than the comparatively relaxed “deliberate indifference” evidentiary criterion, controlled the “shocks the conscience” substantive due process element. Id. at 1720-21. Similarly, the “malicious or sadistic” test of conscience-shocking behavior controls the instant action because, beyond controversy, Officers Birehwell, Lewis, and Spencer had no opportunity to ponder or debate their reaction to the dangerous actions of the armed man.[13]
Hence, even if, as the plaintiffs have argued, the actions of the three defendant patrolmen violated departmental policy or were otherwise negligent, no rational fact finder could conclude, even after considering the evidence in the light most favorable to Quintana, that those peace enforcement operatives acted with conscience-shocking malice or sadism towards the unintended shooting victim. Lewis, 118 S.Ct. at 1721 (dictating that,
“[r]egardless whether [Deputy] Smith’s behavior offended the reasonableness held up by tort law or the balance struck in law enforcement’s own codes of sound practices, it does not shock the conscience, and petitioners are not called upon to answer for it under § 1983.”). See Radecki v. Barela, 146 F.3d 1227, 1232 (10th Cir.1998) (concluding that no conscience-shocking behavior was implicated by a deputy sheriffs emergency enlistment of a civilian bystander’s assistance in subduing a dangerous assailant which prompted the perpetrator to slay the civilian),[14] cert. denied, — U.S. -, 119 S.Ct. 869, 142 L.Ed.2d 771 (1999).
Indeed, the record reflected, without contradiction, that the three defendant undercover agents did not know that anyone was present in the gray Maxima prior to, or during, the exchange of gunfire which caused Quintana’s injury. Thus, the defendants could not have acted maliciously or sadistically towards that unknown individual. See Farmer v. Brennan, 511 U.S. 825, 835-36, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (explaining that malicious or sadistic behavior entails unjustifiable intentional conduct undertaken with the di *361 rect purpose of causing harm to the victim).
Hence, construing all supported allegations and record evidence most favorably for Quintana, no rational fact finder could conclude that Officers Birchwell, Lewis, and/or Spencer violated her substantive due process rights, because the plaintiff cannot prove that they acted with malice or sadism towards her. Thus, the lower court’s summary judgment for those defendants on count three of the amended complaint was correct. See Lewis, 523 U.S. 833, 118 S.Ct. at 1714 n. 5. Furthermore, because the charged official conduct did not inflict any constitutional deprivation upon Quintana, defendant Kirehner, in his official capacity as the Chief Executive Officer of the Nashville-Davidson County Metropolitan Police Department, cannot be liable to her for any alleged neglect to train or supervise those officers, or failure to develop appropriate deadly force policies; therefore the lower court’s summary dismissal of count four was also proper. City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) (“If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point.”) (emphasis the Court’s).
Accordingly, the summary judgments for the defendants which disposed of counts three and four of the amended complaint are AFFIRMED; whereas the summary dismissals of counts one and two are REVERSED, and the action REMANDED for further proceedings concerning those two causes of action as are consistent with this opinion.

. The district court cast its ruling as an alternate dismissal of the complaint for failure to state a claim and/or summary judgment adverse to the plaintiffs.
"Whether a district court has correctly dismissed a suit pursuant to Fed.R.Civ.P. 12(b)(6) [failure to state a claim] is a question of law, and therefore subject to de novo review. The district court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir.1995) (citations omitted). Although the complaint's allegations are construed liberally for the plaintiff, a complaint which does not contain allegations sufficient to support a claim under any legal theory must be dismissed. Id. A court is not bound to accept alleged legal conclusions or unwarranted factual inferences. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir.1987).
Following adequate opportunities for discovery and upon adversarial motion, summary judgment under Fed.R.Civ.P. 56 must be entered against a plaintiff who has failed to produce evidence sufficient to support each element of his or her prima facie case. Celo-tex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Because sufficiency of the evidence is a question of law, a trial court’s grant of summary judgment, like a dismissal under Fed.R.Civ.P. 12(b)(6), is subject to plenary scrutiny. Painter v. Robertson, 185 F.3d 557, 566 (6th Cir.1999); Grider v. Abramson, 180 F.3d 739, 756 n. 7 (6th Cir.), cert. denied,-U.S.-, 120 S.Ct. 528,-L.Ed.2d-(1999).

. Section 1983 provides, in pertinent segment:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]
In any action under section 1983, the plaintiff must prove that (1) he has been deprived of a right secured by the United States constitution or laws, (2) the defendants who allegedly caused that deprivation acted under color of state law, and (3) the deprivation occurred without due process of law. O’Brien v. City of Grand Rapids, 23 F.3d 990, 995 (6th Cir.1994).

. Birchwell testified that "it’s very easy to distinguish a pistol shot from a shotgun. A pistol shot is sort of like a firecracker,” while "a shotgun is a deep, low boom.”

. On April 10, 1997, the district court dismissed all claims asserted against Chief Robert Kirchner in his individual capacity, but retained him as an official capacity defendant, which ruling is not before this appellate forum. An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents. Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Municipalities and counties are "persons” exposed to litigation under section 1983. Mumford v. Basinski, 105 F.3d 264, 267 (6th Cir.), cert. denied, 522 U.S. 914, 118 S.Ct. 298, 139 L.Ed.2d 229 (1997).

. Because the lower court’s analysis of counts one and two focused exclusively upon the sufficiency of the amended complaint's allegations, this review construes the trial court’s dismissal of those causes of action as a Rule 12(b)(6) dismissal for failure to state a claim.

. This court emphasizes that, as to counts one and two of the amended complaint, it rules only that the plaintiffs have sufficiently alleged that they are seeking monetary compensation, as the co-administrators of the decedent's estate, for alleged constitutional torts personally suffered by Claybrook, which affords them standing as vindicators of Clay-brook’s individual federal rights to the extent that his tort claims survived, under Tennessee law, beyond his own death. See Jaco v. Bloechle, 739 F.2d 239, 241-45 (6th Cir.1984); Tenn.Code Ann. §§ 20-5-102 & 106 (1994 & Supp.1998). This reviewing forum expresses no opinion regarding the substantive merits of any claim asserted within counts one and/or two of the amended complaint.

. Because consideration of the sufficiency of the record evidence is necessary to dispose of counts three and four, as developed below, this review construes the lower court's rejection of those causes of action as a summary adjudication. See Fed.R.Civ.P. 12(b) & 56.

. For the reasons developed above, Royal Claybrook Jr. lacks standing under section 1983 to claim compensation for any indirect injuries allegedly caused to him by reason of any constitutional tort suffered by his spouse Quintana Claybrook, irrespective of the potential merits of Quintana’s personal claims.

. The Fourteenth Amendment to the United States Constitution stipulates, in pertinent segment, that "No state shall ... deprive any person of life, liberty, or property, without due process of law[J" U.S. Const, amend. XIV, § 1.

. The Fourth Amendment posits, in relevant portion, that "The right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated[.]” U.S. Const, amend. IV.

. As aptly observed by the Lewis Court:
[T]he police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance.
County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 1720, 140 L.Ed.2d 1043 (1998) (citations omitted). See also Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the *360 amount of force that is necessary in a particular situation.”).

. The plaintiffs' contention that the defendant officers wrongfully incited the violence which injured Quintana by entering the parking lot and driving towards the stationary gray vehicle was misconceived. See Lewis, 523 U.S. 833, 118 S.Ct. at 1720-21. As the Seventh Circuit has commented:
Other than random attacks, all such cases [involving the use of force by criminal justice personnel] begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.
Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir.1994).

. The Radecki court explained:
Deputy Barela had no time for deliberation. The undisputed facts in this record malte clear that Deputy Barela was confronted with the kind of instantaneous judgment call that is so often required of law enforcement personnel, prison officials, and many other government actors called to emergency situations. Sometimes these decisions are negligent, sometimes they are even reckless, sometimes indifferent. Under these circumstances, however, where Plaintiffs have not even alleged that Deputy Barela acted with an intent to harm the participants or to worsen their legal plight, under the Lewis standard there is no constitutional liability.
Radecki v. Barela, 146 F.3d 1227, 1232 (10th Cir.1998), cert. denied, - U.S. -, 119 S.Ct. 869, 142 L.Ed.2d 771 (1999).