Katrina SCOTT, et al., Plaintiffs,

v.

State of MICHIGAN, et al., Defendants.

No. 00–74238.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 14, 2001.

Gary Eisenberg, Gary S. Fields, Southfield, MI, for Plaintiffs.

Margaret A. Nelson, Michigan Department of Attorney General, Tort Defense Division, Lansing, MI, John J. Gillooly, Garan Lucow, Detroit, MI, Laura S. Amtsbuechler, Johnson, Rosati, Farmington Hills, MI, Derek S. Wilczynski, Willmarth, Tanoury, Detroit, MI, for Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT RANDY COSTANZO'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS STATE OF MICHIGAN, MICHIGAN STATE POLICE DEPARTMENT, C.O.M.E.T., AND MICHIGAN STATE POLICE TROOPERS WILLETT, GORDON, AND BUSCH'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

This action, brought pursuant to 42 U.S.C. § 1983, arises from a police chase which resulted in the death of Barbara Scott and the serious injury of Richard and Rachard Scott when their vehicle was hit by a vehicle being driven by Defendant George Jason Allen and being pursued by Michigan State Police Troopers Gordon and Willett. Plaintiffs' allege that Defendants' conduct in connection with this high-speed police chase violated their sub-

stantive due process rights in violation of the Fourteenth Amendment.[1]

This matter comes before the Court on Defendant Randy Costanzo's motion for summary judgment and Defendants State of Michigan, Michigan State Police Department, C.O.M.E.T., and Michigan State Police Troopers Gordon, Willett and Busch's motion to dismiss or for summary judgment. In light of this Court's prior rulings regarding officers who were not involved in the actual police chase, Plaintiffs do not contest the summary dismissal of Defendants Officer Costanzo and State Trooper Busch. Plaintiffs' arguments opposing the summary dismissal of the remaining Defendants are without merit. Defendants' motions are **GRANTED.**

Plaintiffs' substantive due process claims against the State of Michigan, the Michigan State Police Department, as well as the individual State Troopers in their official capacity are barred by the Eleventh Amendment. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Plaintiffs' claims against these officers in their individual capacity are likewise summarily dismissed. Plaintiffs' substantive due process claims based on Defendant State Troopers Gordon and Willett's participation in the police chase fail because Plaintiffs have not presented evidence showing the requisite intent to sustain a substantive due process violation; i.e., a "purpose to cause harm unrelated to the legitimate object of arrest." *County of Sacramento v. Lewis,* 523 U.S. 833, 836, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

The result of this police chase is, without doubt, tragic. Plaintiffs' remedy, however, does not lie in the substantive due process claims pending before this Court.

## I. Facts

C.O.M.E.T. ("County of Macomb Enforcement Team") is a multi-jurisdictional police task force comprised of local and county police officers from the County of Macomb and officers from the Michigan State Police Department. It is governed by a Board of Directors comprised of representatives from each participating agency. *See* Ds' Ex. 5, Bylaws adopted in November 1995, at 2–3. Law enforcement agencies having jurisdiction in Macomb County may participate in C.O.M.E.T. by either assigning enlisted personnel or by making a specified annual monetary or other contribution. *See id.* at 1–2. The assigned personnel are directly supervised by a Unit Commander who is appointed by the Michigan State Police in consultation with the Board. *See id.* at 3. The assignment of personnel is within the discretion of the respective participating agency. *See id.* at 4. Each participating agency

---

1. Plaintiffs' complaint, filed on September 22, 2000, alleged both state law and federal civil rights claims against the State of Michigan, the Michigan State Police, the County of Macomb Enforcement Team ("C.O.M.E.T."), Michigan State Police Troopers Gordon, Willett, and Busch, Detective Colorida, Lieutenant Taylor, Police Officer Randy Costanzo, and George Jason Allen (the alleged fleeing suspect and driver of the car that struck Plaintiffs' vehicle).

This Court dismissed Plaintiffs' state law claims without prejudice on November 3, 2000 and retained jurisdiction over Plaintiffs' federal claims only (Count V). It subsequently granted Defendants Colorida and Taylor's motion for summary judgment thus dismissing Plaintiffs' substantive due process claims against these Defendants. *See* November 5, 2001 Order Accepting in Part and Rejecting in Part the Magistrate's Report and Recommendation and Granting Defendants Taylor and Colorida's Motion for Summary Judgment.

retains responsibility for: (1) all costs of its assigned personnel; i.e., wages, insurance, fringe benefits; (2) legal representation in all civil suits for alleged intentional or negligent acts or omissions arising out of activities performed by the Unit; and (3) actual or punitive damages. *See id.* at 8. Equipment is provided by the State Police and through local and county funding. *See id.* at 5. Participating agencies may withdraw from C.O.M.E.T. upon written notice to the Board. *See id.* at 4.

The C.O.M.E.T. unit involved here included Defendant Busch, a Michigan State Police Trooper; Defendant Randy Costanzo, a city of Warren police officer; and Defendants Taylor and Colorida, detectives with the Macomb County Sheriff's Department. On the date in question, May 30, 2000, the unit was immediately supervised by either Defendant Taylor or a Lt. Trombley of the Michigan State Police Department.[2]

Sometime during the afternoon of May 30, 2000, the C.O.M.E.T. surveillance unit was requested to assist the F.B.I. and local police with an armed bank robbery that had occurred earlier in Roseville, Michigan. The police had already arrested one suspect in the robbery. Information was provided about a second suspect; i.e., that he lived in the general area of Comerica Park in Detroit, Michigan, and was driving a large white truck used for landscaping with a tree logo painted on the driver's door and tree parts in the bed of the truck. This information was conveyed to the C.O.M.E.T. surveillance unit. Lt. Trombley of the Michigan State Police and State Trooper Busch were dispatched, in separate vehicles, to look for the truck at motels along Eight Mile and Gratiot Avenue. Officers Colorida and Costanzo were also dispatched in separate units, to the Comerica Park area to search for the vehicle.

In the early evening hours, the truck was spotted parked on Brush near Comerica Park, and a check of its plates revealed that they belonged to a different vehicle. Shortly thereafter, Officers Colorida and Costanzo observed Defendant George Jason Allen get into the truck and drive off. They both followed the truck to a McDonalds at 1–75 and Mack. Lt. Trombley of the Michigan State Police and Trooper Busch, also in separate unmarked vehicles, headed to the McDonalds. Mr. Allen was at this location a short time and was observed vomiting outside his truck in the far corner of the parking lot. He then left, driving somewhat erratically, and uniformed Michigan State Police Troopers were called to make a stop. All of the surveillance officers were in plain clothes and riding in separate unmarked vehicles without sirens or emergency lights. Michigan State Police Lt. Trombley's radio was not working properly so he instructed Trooper Busch to contact dispatch and request a marked patrol car to make a stop. Trooper Busch did this. She also followed Mr. Allen as he left the McDonalds.

Mr. Allen drove to an apartment building on Michigan at Junction and was followed by the surveilling officers. He was observed first going into the building, then coming out and moving the truck to the rear, and then re-entering the building. By the time a marked unit became available, the truck had arrived at the apartment building, and Mr. Allen had entered the building. The dispatched uniformed State Police Troopers waited for a while, but when Allen did not come out of the apartment building, they departed, being

---

**2.** This Court denied Plaintiffs' motion to amend their complaint to add Lt. Trombley as a party Defendant because the amendment would be futile. *See* August 29, 2001 Mem. Op. & Order denying Plaintiffs motion to amend complaint.

called back to another investigation scene. The C.O.M.E.T. officers maintained their surveillance.

Mr. Allen stayed in the apartment building for a little over two hours. At approximately 10:30, he exited the building with two female companions. They all got into the truck and drove off. The surveillance team followed. State Police Lt. Trombley instructed Trooper Busch to contact the dispatcher for another marked patrol car to stop the truck. The marked patrol car that had responded to the earlier request was still in the area, as instructed, but was now involved with its own traffic stop a block or so away and was unavailable. At Lt. Trombley's direction, Trooper Busch advised the dispatcher a marked patrol car was needed to stop a driver suspected of driving under the influence. She also advised dispatch that the driver was a suspect in an armed bank robbery that had occurred earlier that day. The C.O.M.E.T. officers maintained their surveillance and followed the truck back to an apartment building located at John R and Alfred where Mr. Allen was observed exiting the truck and entering the building.

Trooper Busch stopped in front of the Detroit Police Department's Tactical Services Base at 2600 Brush. Michigan State Police Trooper Gordon heard Busch's request to dispatch and responded that he and his partner, Trooper Willett, could assist. Trooper Busch advised them to meet her at the 2600 Brush location where she was parked, they did so, and she described the truck and informed them that the driver was a suspect in an armed bank robbery that had occurred earlier in the day and that the truck had a license plate that did not belong to it.

Mr. Allen returned to his truck at about 10:50 p.m. and drove away before the uniformed State Police Troopers arrived. Trooper Busch informed Trooper Gordon, the driver of the marked patrol car, of the truck's location. Troopers Gordon and Willett drove off to make the traffic stop. They spotted the truck shortly after it left the building at John R and Alfred, pulled behind it and turned on their emergency lights. The truck did not stop, driving off at a high rate of speed. Trooper Gordon turned on the siren and pursued the truck through Cass Park and out onto Grand River near the Lodge Freeway. He observed the truck almost hit a "homeless" person while driving through the Park. Trooper Busch, in her separate unmarked car, followed Trooper Gordon but fell behind as much as two to three blocks by the time the truck drove through the Park. She did not observe any pedestrians in the Park.

The truck, driven by Mr. Allen, continued west on Grand River. Trooper Gordon continued the pursuit. As they headed west on Grand River, Trooper Willett was in contact with the dispatcher advising of the pursuit and their location. Trooper Busch fell behind, completely loosing sight of the truck and the marked patrol car by the time she arrived at Warren and Grand River. Trooper Busch was not monitoring the pursuit other than to listen for location so as to relay that information to other members of her C.O.M.E.T. team.

Trooper Gordon continued the pursuit of Mr. Allen. The weather was dry, traffic was light with no pedestrians along the route and little cross traffic. Trooper Gordon slowed at each amber and red light and, after clearing the intersection, would accelerate and try and catch the truck. At one point in the pursuit, Trooper Willett testified, the patrol car was going 80 mph after it had slowed for an intersection and was attempting to catch up to the truck. Although traffic was light all along the route, cars in the same lanes of travel as the pursuit were moving to the right side

of the road in response to the patrol car's siren and lights. The truck, driven by Mr. Allen, was avoiding traffic by weaving around and passing vehicles but was not crossing the center line or striking any vehicles as it proceeded down Grand River approaching the intersection at Lahser.

When the truck arrived at the intersection of Grand River and Lahser, the light was red for Grand River traffic. Mr. Allen ran the red light and struck Plaintiffs' mini van. At the time of this collision, the patrol car driven by Trooper Gordon was approximately one-fourth mile behind the truck. The pursuit, which ended at approximately 11:05 p.m., lasted between ten and twelve minutes and covered approximately twelve miles. Trooper Busch and the other plain-clothed C.O.M.E.T. officers arrived at the scene approximately fifteen minutes after the collision occurred. Mr. Allen was already in custody when they arrived.

## II. Summary Judgment Standard

■ Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant has an initial burden of showing "the absence of a

genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. Analysis

### A. Eleventh Amendment Immunity

■ It is well-established that the Eleventh Amendment bars any suit, absent consent, against the state by its own citizens. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001) (observing that "[t]he ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court."). It is likewise "well settled that the Eleventh Amendment bars federal court actions against the agencies and departments of the state, as well as the state itself." *Haddad v. Fromson*, 154 F.Supp.2d 1085, 1090–91 (W.D.Mich.2001) (citing *Pennhurst*, 465 U.S. at 100, 104 S.Ct. 900; *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (*per curiam*)). Also barred by the Eleventh Amendment are claims brought against state employees in their official capacity because "a suit against a state officer in his or her official capacity is tantamount to a suit against the state itself." *Haddad*, 154 F.Supp.2d at 1091 (citing *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)).

■ Congress has not abrogated the Eleventh Amendment immunity of States with regard to suits under 42 U.S.C. § 1983, *see Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), and the State of Michigan has not waived its immunity from suits under § 1983. Moreover, the Supreme Court has specifically

held that a State and its officials, acting in their official capacities, are not "persons" subject to suit under § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). "Moreover, a state agency is not a 'person' for purposes of § 1983." *See Lavrack v. City of Oak Park,* 194 F.3d 1313, 1999 WL 801562, *2 (6th Cir. Sept. 28, 1999) (citing *Howlett v. Rose,* 496 U.S. 356, 383, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990)).

■ Plaintiffs do not dispute that the Eleventh Amendment bars their claims against the State of Michigan. They argue, nonetheless, that their failure to train claims against the Michigan State Police are not barred by the Eleventh Amendment. Plaintiffs are wrong. Defendant Michigan State Police is a department of the State of Michigan "created by statute," *Haddad,* 154 F.Supp.2d at 1091 (citing Mich.Comp.Laws § 16.250), and is thus entitled to Eleventh Amendment immunity. *See Lavrack,* 1999 WL 801562 at *2. As observed by the Sixth Circuit, the Eleventh Amendment immunizes not only the state, but also agencies or departments which act as an arm of the state. *See Thiokol Corp. v. Michigan Dep't of Treasury,* 987 F.2d 376, 381–82 (6th Cir.1993). The Sixth Circuit has further observed that the Michigan Department of State Police is not a "person" subject to suit under § 1983. *See Lavrack,* 1999 WL 801562 at *2. Accordingly, Plaintiffs § 1983 claims against the State of Michigan, the Michigan Department of State Police and State Troopers Gordon and Willett in their official capacities are barred by the Eleventh Amendment. Moreover, Defendant Michigan Department of State Police is not a municipality and thus theories of municipal liability discussed in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); i.e.,

failure to train or supervise, have no application here.

■ Defendant State Troopers Gordon and Willett also argue that, because Plaintiffs' complaint does not specify the capacity in which they are being sued, this Court must construe Plaintiffs' suit as being brought against them in their official capacities only. This Court disagrees. Despite ambiguity in their complaint, Plaintiffs' response clearly states their intent to sue these Defendant State Troopers in their individual capacities and to hold them directly liable for their actions and/or inactions in connection with the alleged violation of Plaintiffs' substantive due process rights. *See Ps' Response at 9.* In light of this and other papers filed by Plaintiffs, this Court finds that Plaintiffs have provided Defendants with sufficient notice that they are being sued in their individual capacities. Accordingly, it will consider whether Defendants are entitled to summary judgment on Plaintiffs' claims against Defendant State Troopers in their individual capacity. *See Perry v. Croucher,* 165 F.3d 28, 1998 WL 661151, *7 (6th Cir. August 31, 1998) (observing that the Sixth Circuit "has considered papers filed by the plaintiff subsequent to the complaint to establish that the plaintiff had given the defendant sufficient notice that the defendant was sued in his personal capacity despite ambiguity in the complaint").

**B. Substantive Due Process Claims**

■ Plaintiffs argue that Defendant State Troopers Gordon and Willett's conduct, after their initial decision to pursue George Allen, violated their substantive due process rights. This Court disagrees. Plaintiffs' substantive due process claims based on these Defendant State Troopers' participation in the police chase fail because Plaintiffs have not presented evi-

dence showing the requisite intent to sustain a substantive due process violation; i.e. a "purpose to cause harm unrelated to the legitimate object of arrest." *County of Sacramento v. Lewis,* 523 U.S. 833, 836, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

As the Supreme Court recently held, "in a high-speed automobile chase aimed at apprehending a suspected offender ... only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscious, necessary for a [substantive] due process violation." *Lewis,* 523 U.S. at 836, 118 S.Ct. 1708. "Lewis plainly stated that the intent-to-harm standard, rather than the deliberate indifference standard, applies to *all* high-speed police pursuits aimed at apprehending suspected offenders." *Helseth v. Burch,* 258 F.3d 867, 871 (8th Cir.2001).

Plaintiffs' attempts to distinguish the facts here from those present in *Lewis* are without merit. Despite Plaintiffs' arguments to the contrary, the requisite "purpose to cause harm unrelated to the legitimate object of arrest" cannot be inferred from the length or duration of the police chase, the fact that it took place in an area where traffic was foreseeable, or from the fact that these Defendant State Troopers could have called the chase off or transferred responsibility to apprehend Mr. Allen to other law enforcement personnel who they argue were positioned along the chase route. *See* Ps' Response at 11. This Court also finds unpersuasive Plaintiffs' arguments that, because of the length of the police chase both in distance and time, Defendants had ample time to deliberate and thus, the *Lewis* intent-to-harm standard should be rejected in favor of a deliberate indifference standard. *See* Ps' Response at 10, 14–16. Arguments similar to Plaintiffs were recently rejected by the Eighth Circuit Court of Appeals.

In *Helseth,* the Eighth Circuit Court of Appeals overruled a contrary Eighth Circuit decision because "the panel paid too little heed to the Supreme Court's *holding* in *Lewis* ". *Id.* (overruling *Feist v. Simonson,* 222 F.3d 455 (8th Cir.2000)). Its criticism of the *Feist* decision applies equally as well to Plaintiffs' arguments here. The *Feist* panel was criticized for using language in *Lewis* "as an invitation to reject intent-to-harm as the governing standard whenever a judge or a jury could say, with the wisdom of hindsight, that an officer engaged in a high-speed pursuit had 'ample time to deliberate' " because "this reasoning not only produces a standard that eviscerates the holding of *Lewis,* it also gives too little recognition to the Court's other bases for that holding—its historical reluctance 'to expand the concept of substantive due process.' " *Helseth,* 258 F.3d at 871 (quoting *Lewis,* 523 U.S. at 842, 118 S.Ct. 1708). The *Helseth* Court further observed that "[s]ince *Lewis,* all other circuits that have examined the issue have applied the intent-to-harm standard in high-speed police pursuits cases, without regard to the potentially limiting factors identified by the panel in *Feist*—the length of the pursuit, the officer's training and experience, the severity of the suspect's misconduct, or the perceived danger to the public in continuing the pursuit." *Id.* (citing cases).

Plaintiffs have not come forward with evidence as to Defendant State Troopers Gordon and Willett that would satisfy the shocks-the-conscious test announced by the *Lewis* Court, and thus their substantive due process claim against these Defendants must be dismissed. A defendant cannot be held liable in a § 1983 action for conduct that does not give rise to an alleged constitutional violation.

### C. § 1983 Claims Against C.O.M.E.T.

■ Defendants argue that Plaintiffs' substantive due process claims against

C.O.M.E.T. must be dismissed because Defendant C.O.M.E.T. is not an entity subject to suit and thus is not a "person" subject to suit under 42 U.S.C. § 1983. Defendants explain that C.O.M.E.T. ("County of Macomb Enforcement Team") is a multi-jurisdictional cooperative police task force made up of law enforcement agencies having jurisdiction in Macomb County, including the Michigan State Police Department and the Macomb County Sheriff's Department, that is governed by Bylaws adopted by its Board of Directors. *See* Ds' Ex. 5, Bylaws adopted in November 1995. They assert that C.O.M.E.T. is not an entity subject to suit because it is not a cooperative governmental agency formed under Michigan's Urban Cooperation Act of 1967, Mich.Comp.Laws § 124.501, et. seq., and thus cannot bring suit in its own name or be sued. Plaintiffs, without providing any supporting authority, state their disagreement with this position.

■ There is no need to reach this issue. Even if C.O.M.E.T. is a governmental entity that can be sued under § 1983, Plaintiffs' claims against C.O.M.E.T. are properly dismissed. It is well-established that a failure to train or supervise claim "cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee." *Young v. City of Mount Ranier,* 238 F.3d 567, 579 (4th Cir.2001). The Tenth Circuit Court of Appeals recently reached the same conclusion in a § 1983 case similarly involving a police chase where innocent bystanders were harmed. It held that a municipality could not be held liable under § 1983 claims when the actions of its employees were determined not to have violated the plaintiff's constitutional rights. *See Trigalet v. City of Tulsa,* 239 F.3d 1150, 1154 (10th Cir.2001). The *Trigalet* Court observed that support for its position "is found in

the decisions of our sister courts as well." *Id.* at 1154–55 (listing supporting decisions including "*Scott v. Clay County, Tenn.,* 205 F.3d 867, 879 (6th Cir.), *cert. denied,* 531 U.S. 874, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000) (holding that conclusion no officer-defendant deprived plaintiff of any constitutional right a fortiorari defeats claim against county); *Claybrook v. Birchwell,* 199 F.3d 350, 361 (6th Cir.2000) (same)"). The same rationale and result apply here. This Court's conclusion that no officer-defendant deprived Plaintiffs of their substantive due process rights likewise defeats Plaintiffs' claims against the employer/supervisor of these Defendants.

## IV. Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are **GRANTED.**