RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MELISSA ANN BARBER; STEVEN BARBER; DAVID
HALL; PAUL JENSEN; JENNIFER KULA-HAUK;
STEVEN PETTIT; TROY HUIZING,
          *Plaintiffs-Appellants,*

          *v.*

WILLIAM OVERTON, Director of the Michigan
Department of Corrections, in his official capacity;
FRITZ JACKSON; LORENZO LOWERY; BRUCE
SIEBERT, in their individual and official capacities,
          *Defendants-Appellees.*

No. 05-2014

>

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 03-00329—Robert Holmes Bell, Chief District Judge.

Argued: December 1, 2006

Decided and Filed: August 2, 2007

Before: KENNEDY, COLE, and COOK, Circuit Judges.

---

### COUNSEL

**ARGUED:** H. Rhett Pinsky, PINSKY, SMITH, FAYETTE & KENNEDY, Grand Rapids, Michigan, for Appellants. A. Peter Govorchin, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** H. Rhett Pinsky, PINSKY, SMITH, FAYETTE & KENNEDY, Grand Rapids, Michigan, for Appellants. A. Peter Govorchin, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

          KENNEDY, J., delivered the opinion of the court. COOK, J. (pp. 9-11), delivered a separate concurring opinion. COLE, J. (pp. 12-16), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

          KENNEDY, Circuit Judge. This case involves the Michigan Department of Corrections' (MDOC) release of several corrections officers' social security numbers and birth dates to prisoners held at the Ionia Maximum Security Correctional Facility (IMAX), which houses male prisoners

1

who pose an extreme escape risk or who have a clearly demonstrated history of violent acts toward other prisoners and staff. The disclosure occurred in the context of the prison's investigation into prisoners' allegations of abuse by corrections officers and the resulting disciplinary hearings. The plaintiffs, IMAX corrections officers, filed a number of claims under 42 U.S.C. § 1983 and Michigan law, and now appeal the district court's dismissal of several of their § 1983 claims against Overton[1] and Jackson and its grant of summary judgment to defendants Bruce Sibert and Lorenzo Lowery.

## I. Background

In 2002, two prisoners accused several corrections officers of sexually assaulting them. Defendant Bruce Sibert investigated the matter on behalf of the prison's Internal Affairs section. He detailed the results of the investigation and summarized interviews of corrections officers in a report. In accordance with MDOC Internal Affairs[2] Investigative Manual, p.18 (March 2002), these summaries contained the officers' names, social security numbers, and dates of birth.

Sibert concluded from his investigation that the allegations were baseless. In light of his findings, MDOC charged the accusing prisoners with "interference with administrative rules," a major misconduct charge that entitled the prisoners to a hearing. Prior to the hearing, defendant Lorenzo Lowery gathered information, including Sibert's Internal Affairs report.

Defendant Fritz Jackson, the hearing officer, reviewed the documents Lowery had collected and found the prisoners guilty of major misconduct. Jackson testified in his deposition that Lowery had marked sections of the report for possible redaction on pages 5 and 20 (and in the appendix). These sections related to two prisoner informant witnesses. Jackson ordered these items redacted; he was the only person with authority to order redactions.

Following the hearing, the prisoners appealed the charges and requested the information on which Jackson's ruling relied. Lowery then physically redacted the informant's identifying information in the Internal Affairs report in accordance with Jackson's rulings, stamping each page with a statement identifying that it was being delivered to the prisoner. Because it was not marked for possible redaction, and thus was not ruled on by Jackson, Lowery did not redact the officers' personal information. The name, birth date, and social security number of each officer appeared in a caption identifying each officer's statement, rather than in Sibert's summary of the that officer's statement. If noticed, this information would be exempt from release and would not have been given to prisoners under internal prison policy and the department's Freedom of Information Act (FOIA) policy. Lowery stated in an affidavit that if he had noticed the social security numbers he would have removed them. Nonetheless, Lowery delivered the report, including the officers' personal information, to the prisoners via institutional mail as part of the hearing packet.

---

[1] Plaintiffs appeal a district court order that granted summary judgment in favor of Overton, but do not pursue their claims against him here. Therefore, we consider those claims waived.

[2] Internal Affairs handles investigations of allegations against employees of MDOC. Generally, unless "involved in felonious conduct [in] conspir[acy] with an employee," MDOC Policy Directive 01.01.140(G), prisoners do not fall under Internal Affairs' jurisdiction.

With this personal information in hand, IMAX prisoners began to torment the officers. As the plaintiffs' complaint explains, prisoners have threatened and taunted the officers, often incorporating the plaintiffs' social security numbers (which they have committed to memory) into the taunts. Some prisoners wrote the social security numbers of some of the plaintiffs on slips of paper that they threw out of their cells. Others incorporated one officer's number into a death threat they wrote on a prison wall. More importantly, using the social security numbers the prisoners obtained other confidential information, including the plaintiffs' home addresses and discovered the names of their family members, including their children. Prisoners have even accurately described plaintiffs' children to them. In addition, prisoners discovered plaintiff Melissa Barber's social security number – apparently using the number of her husband, Steven Barber. Prison officials intercepted in prison mail photos of Melissa Barber's house and car, apparently taken by a prisoner's accomplice outside the prison.

Plaintiffs Melissa Barber, Steven Barber, David Hall, Paul Jensen, Jennifer Kula-Hauk, Steven Pettit, and Troy Huizing filed suit in the Western District of Michigan, naming as defendants William Overton, Director of the Michigan Department of Corrections, in his official capacity, and Fritz Jackson, Lorenzo Lowery, and Bruce Sibert in their individual and official capacities. The district court dismissed the plaintiffs' claims against Fritz Jackson because it found he was entitled to absolute judicial immunity. Subsequently, the court granted summary judgment to defendants Sibert and Lowery on the plaintiffs' 42 U.S.C. § 1983 claims, holding that they are entitled to qualified immunity. Further, it dismissed Melissa Barber's § 1983 claims, finding she lacked standing. Because it concluded defendants did not violate the plaintiffs' constitutional rights, the court also denied the plaintiffs' request for injunctive relief under § 1983. The plaintiffs then filed this appeal.[3]

## II. Defendant Jackson

The district court dismissed the plaintiffs' claim against Hearing Officer Jackson pursuant to Fed. R. Civ. P. 12(b)(6) because it concluded Jackson is entitled to absolute judicial immunity. We review a dismissal under Rule 12(b)(6) *de novo*. *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996).

In granting Jackson absolute immunity, the district court relied on *Shelly v. Johnson*, 849 F.2d 228 (6th Cir. 1988), which held that a Michigan hearing officer was entitled to absolute judicial immunity for actions taken in his hearing-officer capacity, and on Mich. Comp. Laws § 791.252(h), which grants a Michigan hearing officer the authority to deny access to evidence that may be dangerous to a witness or disruptive to normal prison operations. The plaintiffs contend that this ruling ignores the role that Jackson played in this case, one they cast as a FOIA Coordinator, rather than a hearing officer.[4] The plaintiffs claim that the "functional approach" to judicial immunity

---

[3] The court also dismissed the suit for damages against defendant Overton in his official capacity, but plaintiffs do not challenge that decision on appeal.

[4] There is some ambiguity whether the state's release of these documents to prisoners is actually done under the dictates of FOIA. Section III.I of Michigan Department of Corrections Policy Directive 01.06.110 directs that "[p]risoners shall not be entitled to receive or inspect documents under the FOIA." Section III.J, however, states, "Although prisoners shall not be entitled to receive or inspect documents under the FOIA, they shall continue to receive copies of appropriate forms when they are generated (e.g. major misconduct reports; administrative hearing reports; security classification screens; notices of parole board action; time review and disposition forms)." The district court addressed the issue as follows:

> A review of the prisoner's request for hearing materials, however, reveals that their request was not made pursuant to FOIA. . . . Moreover, the Department's FOIA policy states that prisoners are not entitled to receive documents under FOIA and such requests are summarily denied. . . . The Court recognizes that the Department FOIA policy does permit a prisoner to request a copy of their hearing

discussed by this court in *Achterhof v. Selvaggio*, 886 F.2d 826 (6th Cir. 1989), counsels against absolute immunity for Jackson. *Achterhof* recognizes that this circuit's approach to absolute immunity distinguishes "between prosecutorial and judicial duties and duties which are administrative or investigatory." 886 F.2d at 829. The plaintiffs' attempts to cast Jackson's role as administrative are not persuasive, however.

The plaintiffs argue that Jackson was "*functionally performing* the actions of any administrator responding to an information request." Pointing to Michigan Policy Directive 01.06.110, section III.L, the plaintiffs contend that Jackson's role was that of an administrative processor of prisoner requests. They contend that the following language from that directive supports this view: "Upon request, prisoners shall be provided with a copy of their hearing investigation for any formal hearing, except those documents which have been determined by the hearing officer to be confidential." This instruction, however, does not transform Jackson's role. As Jackson's and Lowery's depositions confirm, Lowery as Hearing Investigator was responsible for processing requests for information, not Jackson. Jackson, as Hearing Officer, makes final decisions about what information should be released, but he does not act as an administrator facilitating the process. In fact, Jackson's role is completely separate from the request process, as he never sees the prisoners' requests, nor does he play any role in delivering the documents. Though Jackson's role has him concerned with the department's FOIA policy, it is better viewed as an exercise of his hearing-officer authority. He performs a judicial function when he reviews the prison administration's request (prepared by Lowery) to redact portions of the state's basis for charging the prisoners with major misconduct. Determining what materials prisoners are entitled to receive as part of their due process hearing is a judicial function. We hold the district court did not err in construing Jackson's action as judicial, rather than administrative, and in granting Rule 12(b)(6) dismissal.

## III. Defendants Lowery and Sibert

Plaintiffs also challenge the district court's finding that Lowery and Sibert are entitled to qualified immunity. We review such a determination *de novo*. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000).

*a. Legal Framework*

Qualified immunity involves a two-fold inquiry: First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . [T]he next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Section 1983 actions also involve a two-part analysis: As with the qualified immunity inquiry, the plaintiff must suffer a deprivation of a federal constitutional or statutory right. In addition, that violation must be caused by a person acting under the color of state law. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). "The Due Process Clause of the Fourteenth Amendment does not impose upon the state an affirmative duty to protect its citizens against private acts of violence, but rather, places limitations on affirmative state action that denies life, liberty, or property without due process of law." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065 (6th Cir. 1998). That is, the Fourteenth Amendment does not (in the ordinary case) provide private citizens a right

---

investigation materials.

Dist. Ct. Mem. Op. and Order at 3 (Dec. 2, 2004). We decline to resolve this ambiguity because the nature of FOIA's application to prisoner requests does not change the outcome of the absolute immunity analysis. Because the plaintiffs cannot show that Jackson was acting as a "FOIA Coordinator" as they contend, his actions were judicial, not administrative, and whether FOIA applies matters not.

to be free from prisoner abuse if those prisoners are not acting under the color of state law.[5] Since Lowery and Sibert did not themselves threaten the plaintiffs or subject them to acts of violence, they would not normally be liable under § 1983. However, in *Kallstrom* we noted an exception: A section 1983 plaintiff could circumvent the state action requirement if he demonstrated that the state created a special danger.

Thus the state created danger doctrine, on which plaintiffs heavily rely, is properly understood as a caveat to the color of state law requirement. "In other words, while the state does not shoulder an affirmative duty to protect its citizens from acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its affirmative acts." *Kallstrom*, 136 F.3d at 1066. As indicated by *Kallstrom*, state created danger is not predicated upon but-for causation; rather it is more akin to the notion of proximate causation. Our cases have spoken in terms of "creating risk" or "greatly increasing risk," rather than in terms of "causing harm." Thus, we have developed a three-part test: "an affirmative act that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability." *McQueen v. Beecher Comty. Schs.*, 433 F.3d 460, 464 (6th Cir. 2006). As to the first part, we have noted that the increase in risk must be substantial. *See, e.g., Summar v. Bennett*, 157 F.3d 1054, 1059 n.2 (6th Cir. 1998). As to the third, the requisite culpability in this circumstance, i.e. one that "provide[d] opportunity for reflection and unhurried judgments," *McQueen*, 433 F.3d at 469, is deliberate indifference.

Because of the majority of the Supreme Court's insistence on addressing qualified immunity at the outset, *Saucier*, 533 U.S. at 200, we apply the following analysis in a case that invokes both qualified immunity and a § 1983 action predicated on the state created danger doctrine: First, identify the constitutional right and determine whether it has been violated. Second, determine whether that right was, at the time the violation occurred, clearly established. Third, determine whether the actor violating the right was acting under color of state law, that is, whether the state actor created or greatly increased a danger that was specific to the plaintiffs and did so with deliberate indifference. Because we conclude that no constitutional violation occurred, we will omit the second and third steps.

*b. Constitutional Violation*

First we must determine whether the states are required, by the Constitution, to keep plaintiffs' social security numbers and dates of birth private. Plaintiffs rely on *Kallstrom*, claiming that the state's release of this private information exposed them to a serious risk of bodily harm or death at the hands of the informationally-empowered prisoners. This risk, they argue, implicates their liberty interest in personal security under the substantive component of the due process clause. A cursory examination of *Kallstrom*, however, indicates that that case did not define a right that would entitle plaintiffs to relief here.

In *Kallstrom*, the plaintiffs were City of Columbus police officers involved in an undercover investigation of "the Short North Posse, a violent gang in the Short North area of Columbus, Ohio." *Kallstrom*, 136 F.3d at 1059. Forty-one of the gang members were prosecuted and the plaintiffs, three undercover police officers, testified at their trials. On request, the City of Columbus deliberately released the plaintiffs' personnel files to the attorney of several gang members in accordance with the city's written policy. These files included:

the officers' addresses and phone numbers; the names, addresses, and phone numbers of immediate family members; the names and addresses of personal references; the

---

[5] Prisoners might, for example, act under color of state law when they are performing services on behalf of the prison.

officers' banking institutions and corresponding account information, including account balances; their social security numbers; responses to questions regarding their personal life asked during the course of polygraph examinations; and copies of their drivers' licenses, including pictures and home addresses.

*Id.*

The district judge granted a temporary restraining order prohibiting release of the files, but refused to enter a permanent injunction when it concluded that this circuit had "'steadfastly refused to recognize a general constitutionally-protected right to privacy that would shield an individual from government release of personal information about the individual.'" *Id.* at 1060 (quoting Dist. Ct. Op. at 4). The officers appealed.

This court canvassed the law regarding the substantive due process right to privacy. It noted that this right was bifurcated, including not only the right to be free of state interference when making decisions of important and intimate personal matters, *see, e.g., Griswold v. Connecticut*, 381 U.S. 479 (1965), but also the right to avoid state disclosure of highly personal matters, *see, e.g., Whalen v. Roe*, 429 U.S. 589, 598-600 (1977). In this circuit, this latter privacy right to non-disclosure (the only right relevant here), has been construed narrowly, *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (6th Cir. 1981), only protecting citizens from disclosure when the circumstances implicate "personal rights that can be deemed fundamental or implicit in the concept of ordered liberty." *Id.* at 1090 (citations and quotation marks omitted).

It is here that the *Kallstrom* court broke new ground. It held that the officers' privacy interest implicated an important liberty interest; to wit, an interest in preserving their and their families' personal security and bodily integrity. That is, it held that the released information was sensitive enough to put their lives at risk. This liberty interest was implicated for two reasons: (1) the gang members had a propensity for violence and intimidation and (2) those members were likely to seek revenge. However, the court explicitly limited its holding:

> [T]he district court found that the City's release of the plaintiffs-appellants' addresses, phone numbers, and driver's licenses to defense counsel . . . as well as their family members' names, addresses, and phone numbers, created a serious risk to the personal safety of the plaintiffs and those relatives named in the files. . . . The district court did not make any explicit findings with respect to whether disclosure of the remaining personal information contained in the officers' personnel files – results of the polygraph tests, *social security numbers*, and financial account information – put the officers at substantial risk of serious bodily harm. On remand, the district court should consider the extent to which the release of this information jeopardized the officers' personal security, and whether the threat, if any, implicated the officers' constitutionally protected interests in privacy and bodily integrity.

*Id.* at 1063, 1063 n.2 (emphasis added). We note also, as far as our research can divine, that this combination of privacy right violation and state created danger claim is virtually unique among courts of appeals.[6] In addition, the disclosure here only provided a means of acquiring the kind of

---

[6] No other circuit has explicitly held that a breach of a plaintiff's right to privacy could implicate a claim predicated on a state created danger theory. *See, e.g., Frances-Colon v. Ramirez*, 107 F.3d 62 (1st Cir. 1997) (baby mishandled and injured during delivery at municipal hospital); *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993) (protestor attacked and beaten by skinheads who were enabled by police); *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996) (drunken pedestrian suffered debilitating brain injury during fall after police declined to arrest her for public intoxication); *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995) (plaintiff's children killed in a fire set by her boyfriend); *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198 (5th Cir. 1994) (high school student killed by a nonstudent); *Stevens v. Umsted*, 131 F.3d 697 (7th Cir. 1997) (disabled student sexually assaulted by another student); *S.S. ex rel. Jervis v.*

sensitive information directly disclosed in *Kallstrom*; acquiring the sensitive information required an additional wrongful act by the prisoners.

We belabor the discussion of *Kallstrom* to emphasize what it did *not* do: It did not create a broad right protecting plaintiffs' personal information. Rather, *Kallstrom* created a narrowly tailored right, limited to circumstances where the information disclosed was particularly sensitive and the persons to whom it was disclosed were particularly dangerous *vis-a-vis the plaintiffs*. We cannot conclude that social security numbers and birth dates are tantamount to the sensitive information disclosed in *Kallstrom*. The court's careful footnote in that case, instructing the district court on remand, should put that to rest. If mere disclosure of social security numbers were sufficient then there was no need for the remand. In addition, *Kallstrom* did not restrict any private information from disclosure to anyone in any circumstances, but rather only *certain* restricted information when the plaintiffs had a reason to fear retaliation from persons to whom it was disclosed.

In light of our narrow reading of the substantive due process right to non-disclosure privacy, we conclude that the release of the social security numbers was not sensitive enough nor the threat of retaliation apparent enough to warrant constitutional protection here.[7] First, scary though it may be, the diligent miscreant who wishes to exact vengeance can locate a person with limited information. Plaintiffs' names, general whereabouts (near the IMAX facility), and approximate ages were already known to these prisoners. While the social security numbers and birth dates might have pinpointed the residence of a particular plaintiff, there are other methods of learning where persons reside; several hours in a car or several telephone calls might well provide the very same information. Voter registration records, county property records, and a plethora of other publically available sources exist through which persons can discover the residency of an individual and prisoners' accomplices have as ready access to them as any other citizen. The plaintiffs do not allege that this information allowed the prisoners to discover information that they would have been unable to otherwise. Therefore, this information does not rise to the level of sensitivity we found constitutionally significant in *Kallstrom*.[8]

Second, while there is can be no doubt that plaintiffs have a dangerous job, their relationship to the prisoners is not defined by the clear animosity apparent in *Kallstrom* where the plaintiffs had

---

*McMullen*, 225 F.3d 960 (8th Cir. 2000) (child sodomized by pedophile); *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) (nurse at prison raped by an inmate); *Armijo ex rel. Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253 (10th Cir. 1998) (special education student at public school committed suicide); *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560 (11th Cir. 1997) (plaintiff's son committed suicide); *but see Hart v. City of Little Rock*, 432 F.3d 801 (8th Cir. 2005) (in a case factually similar to *Kallstrom*, the court assumed, without deciding, that plaintiffs constitutional right to privacy was violated but denied relief because the state actor did not possess the requisite culpability for a § 1983 claim).

[7] The dissent criticizes us for holding, "as a matter of law," "that social security numbers [ ] are not sufficiently sensitive," Cole Op., *post* at 13. That is not our holding as that question is not before us. Rather, our holding concerns the interplay between both the sensitivity of the information and the threat of retaliation. We express no opinion whether either of these factors, taken alone, would distinguish *Kallstrom*.

[8] On remand from *Kallstrom*, several news organizations intervened in an attempt to require the City of Columbus to turn over certain information from the officers' personnel records for an investigation the news organizations were conducting. Therefore, the district court was asked to determine which specific pieces of information implicated the Constitution. Recognizing the propriety of our holding in *Kallstrom*, it noted that "[a]ddresses are part of the public domain. Anyone with an individual's name and either Internet access or the initiative to visit a local government office can scan county property records, court records, or voter registration records for such information as an individual's address, the exact location of his or her residence, and even a floor plan of the home. The Supreme Court has found that 'the interests in privacy fade when the information involved already appears on the public record.' In this case, plaintiffs have voluntarily revealed their own identities. For instance, plaintiffs initiated this lawsuit in their own names and describe their profession in the pleadings as 'undercover narcotics officers.'" *Kallstrom v. City of Columbus*, 165 F. Supp. 2d 686, 695 (S.D.Oh. 2001) (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-95 (1975)).

gone undercover, infiltrated a violent gang, and testified against them at trial. While we do not condone nor indicate that we consider in any way prudent the release of the information to these prisoners, we also must remember that the right we created in *Kallstrom* was exceeding narrow. The relationship here is not sufficiently analogous.

> Finally,
>
> [o]ur opinion does not mean that we attach little significance to the right of privacy, or that there is no constitutional right to nondisclosure of private information. . . . Our opinion simply holds that not all rights of privacy or interests in nondisclosure of private information are of constitutional dimension, so as to require balancing government action against individual privacy. As with the disclosure in *Paul v. Davis*, [424 U.S. 693 (1976),] protection of appellants' privacy rights here must be left to the states or the legislative process.

*DeSanti*, 653 F.2d at 1090-91.

Since we find that no right was violated, we need not engage in the weighing analysis laid out in *DeSanti*, 653 F.3d at 1090-91, and its progeny.

## IV. Melissa Barber's Standing

Plaintiff Melissa Barber challenges the dismissal of her claim for lack of standing. In its dismissal, the district court relied on *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000), which held that a § 1983 claim is "entirely personal to the direct victim of the alleged constitutional tort." *Claybrook* examined whether relatives or dependents of a constitutional-tort victim could bring claims for "emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." *Id.* (citations omitted). Her claim is different, Barber argues, because her injuries are not caused by her husband's injury; rather, the state's disclosure enabled the prisoners to learn her personal information, which the prisoners then used to inflict injuries directly upon her. This fails to defeat *Claybrook*'s rule, however, because the alleged constitutional tort in this case is the state's release of her husband's private information. *See Kallstrom,* 136 F.3d at 1059. Barber cannot point to an affirmative act committed by the government which violated her constitutional rights. Although she can trace her injury to the government's release of her husband's information, this does not render her a direct victim for purposes of bringing a § 1983 claim. Because Melissa Barber's information was not released by the state, the state did not violate her constitutional rights, and she therefore cannot proceed under § 1983.

Her rejoinder—that the state-created-danger doctrine cures this deficiency—is unavailing. The state-created-danger doctrine does not create a constitutional right that Barber may employ in a § 1983 action; instead, it permits plaintiffs who have suffered constitutional harms inflicted by third parties who were facilitated by the government's affirmative acts to satisfy the state-action requirement of § 1983. The doctrine does not confer standing on anyone injured as a result of the government's violation of another person's rights, no matter how interrelated the harms suffered. We affirm the district court's dismissal of Melissa Barber's § 1983 claim.

## V. Conclusion

Therefore, the judgment of the district court is **AFFIRMED**.

---

**CONCURRENCE**

---

COOK, Circuit Judge, concurring. I concur in the majority's opinion in its entirety. I write separately to elaborate on the majority's observation about the "virtual uniqueness" of the combination of a privacy-right violation with a state-created-danger claim, as presented both in this case and in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998). *See ante* at 6. *Kallstrom* blends two conceptually distinct forms of § 1983 analysis in a duplicative and confusion-creating mix that leads this panel down an errant path. For cases with like circumstances, it is worth rethinking *Kallstrom*.

The state-created-danger doctrine holds the State responsible to protect citizens against private-actor invasions of life, liberty, and property when the State, through its affirmative acts and with the requisite level of culpability, establishes a special danger increasing the likelihood that a private actor would violate a person's life, liberty, or property rights. *See, e.g.*, *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006). The doctrine integrates with § 1983's two requirements as follows: An individual is deprived of a substantive due process right—life, liberty, or property—by a private actor, which satisfies § 1983's deprivation requirement. That actor was enabled by the State to a degree that the plaintiff can rightly hold the State liable for its failure to protect him from the private deprivation. Section 1983's state action requirement is satisfied by the state-created-danger doctrine's three-element test, which ensures that the state acted (1) affirmatively, (2) with respect to the plaintiff in particular, and (3) "with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment."[1] *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464-69 (6th Cir. 2006) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)); *see also, e.g.*, *Jones*, 438 F.3d at 690.

In every § 1983 case employing the state-created-danger method to tie state action to private violence—other than *Kallstrom* and this one—a private actor actually *violated* the plaintiffs' constitutional rights and the government itself did not. In each of these cases, identifying the deprivation was a straightforward exercise: the killed, beaten, raped, or otherwise injured victims suffered a physical invasion that clearly implicated their substantive due process rights. *See Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007) (victim killed by drunk driver); *Jones*, 438 F.3d 685 (victim died after being struck by a car drag-racing on a public street); *May v. Franklin County Comm'rs*, 437 F.3d 579 (6th Cir. 2006) (victim murdered by her boyfriend); *McQueen*, 433 F.3d 460 (student shot and killed by another student); *Jackson v. Schultz*, 429 F.3d 586 (6th Cir. 2005) (victim died in an ambulance after sustaining gunshot wounds in barroom brawl); *Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir. 2005) (child killed by speeding motorist); *Cartwright v. City of*

---

[1] The D.C. Circuit in *Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001), offered a slightly different way of thinking about this framework. *Butera* identified the right deprived as follows:

> We join the other circuits in holding that, under the State endangerment concept, an individual can assert a *substantive due process right to protection* by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm.

*Id*. at 651 (emphasis added). This formulation articulates a right that attaches directly to the government: the State violates a person's constitutional rights when it fails to protect him from third-party harms that it helped create. Under this formulation, the deprivation is somewhat indirect, and occurs in the State's failure to protect a person after it has placed him in danger; the State could satisfy its duty if it prevents any harm from occurring after it commits the affirmative acts that created the harm. But the deprivation is committed by the State, rather than a third party, which better conforms to conventional § 1983 thinking.

*Marine City*, 336 F.3d 487 (6th Cir. 2003) (victim hit by a truck and killed after police transported him to a convenience store parking lot from the shoulder of a highway); *Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003) (mentally disabled woman raped after police returned her to home of assailant after she requested to be returned); *Jones v. Union County*, 296 F.3d 417 (6th Cir. 2002) (victim shot, but not killed, by abusive ex-husband); *Sheets v. Mullins*, 287 F.3d 581 (6th Cir. 2002) (infant victim killed by his father); *Ewolski*, 287 F.3d 492 (victim shot fatally himself and his son during a police standoff); *Weeks v. Portage County Executive Offices*, 235 F.3d 275 (6th Cir. 2000) (victim beaten by private actor, denied help by the police, and then died); *Summar v. Bennett*, 157 F.3d 1054 (6th Cir. 1998) (police informant murdered after inclusion of his name on an indictment); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907 (6th Cir.1995) (child suffered fatal heart failure on a school bus); *Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994) (victim died after being abducted by a car wash employee); *Caldwell v. City of Louisville*, 120 F. App'x 566 (6th Cir. 2004) (victim murdered by abusive boyfriend); *Waller v. Trippett*, 49 F. App'x 45 (6th Cir. 2004) (prison employee murdered by prisoner). As the majority notes, the same feature prevails in other circuits. *See ante* at 6-7.

In the typical state-created-danger case, then, the plaintiff complains about a harmful act by a private actor, facilitated by the government to such a degree that the harm can be said to result from state action. *Kallstrom*, on the other hand, invoked the state-created-danger formulation in the *absence* of any harm from a private actor—an entirely unique circumstance. Examining the two branches of the *Kallstrom* analysis (really two claims blended into a peculiar hybrid) brings the matter into focus. *Kallstrom* first acknowledged and explained its recognition of the Columbus officers' *direct claim* against the City, premised on the privacy deprivation suffered by the officers when the City released the records. 136 F.3d at 1060-65. The success of that claim hinged on whether the privacy right breached was of constitutional dimension, and whether the government acted with the requisite level of culpability. At that juncture, one might have expected the panel to wrap up. But the opinion went on to discuss what could only be another claim against the City—one also premised on the City's release of the same private information—a claim seeming to lack a deprivation caused by private violence. That is, the panel discussed the role the City's release played in increasing the *risk* of violence/harm to the officers. *Id*. at 1066-67. Evaluating the City's § 1983 liability by way of a state-created-danger theory seems peculiar for two reasons: (1) the direct claim assessed the danger/risk aspect of the record's release in concluding that the City breached the officers' constitutional rights, and (2) there being no additional deprivation of constitutional privacy rights by any private actor (courts have never recognized a constitutional right to be free from harassment or threats of violence), no basis existed to engage in a state-created-danger analysis. Increased exposure to risk, as discussed in the context of state-created danger, concerns the backward look courts take to find state action after an injury. My search for another case where exposure to "increased risk" sufficed to hold a state actor responsible produced none. *Supra* at 9-10. The point is, no constitutionally cognizable injury exists in the absence of physical harm to *tie* to the State's action.

*Kallstrom* employed the state-created-danger doctrine for a purpose other than linking private actor deprivations and government facilitation; instead, it used the doctrine to assess whether the plaintiffs could "prove up" their damages. Because the *Kallstrom* plaintiffs already demonstrated that the City violated their constitutional rights with the requisite state of mind, what was left but the issue of damages—the harm suffered from the increased risk of violence at the hands of the Short North Posse. This may be a sound means of testing the connection between a plaintiff's privacy claim and the damages claimed to flow from it, but *Kallstrom*'s application of the doctrine departs significantly from its intended use.

If Lowery directly violated the plaintiffs' constitutionally recognized privacy rights, then we need not concern ourselves with the way in which Lowery's actions enabled private actors for state action purposes. If the plaintiffs can point to the defendant's violation of a constitutionally

recognized privacy right protecting them from State disclosure of their private information, then they would have a direct cause of action under § 1983 against Lowery. These plaintiffs' constitutional rights were violated, if at all, by Lowery, who, as he admits, was acting under color of state law in performing his duties. One could ask, as the D.C. Circuit does, *see Butera*, 235 F.3d at 651, given the State's duty to protect the prison guards, how did it breach that duty? The breach is not the affirmative act of releasing the documents, because the affirmative act merely created the dangerous situation which gave rise to the duty to protect—the breach cannot precede the very existence of the duty. The plaintiffs have yet to suffer any private violence at all, so, arguably, the state did not fail in its duty to protect them from the private violence its actions could have enabled.

Properly framed, I would examine the plaintiffs' claim under the direct-injury rubric of *County of Sacramento v. Lewis*, which would require them to show that the defendants' conduct in releasing their information violated their constitutional right to privacy and that the defendants did so in a manner that "shocks the conscience." 523 U.S. 833, 846-49 (1998). Because I agree with the majority that these plaintiffs did not suffer a constitutional privacy deprivation, and because Lowery's failure to redact, though unfortunate, does not shock the conscience, I would affirm the district court on these grounds.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

R. GUY COLE, JR., Circuit Judge, concurring in part and dissenting in part. I agree with the majority that cases involving qualified immunity and a § 1983 action predicated on the state-created-danger doctrine require that we answer three questions. We must (1) identify the constitutional right and determine whether it was violated, *Saucier v. Katz,* 533 U.S. 194, 200 (2001); (2) determine whether that right was clearly established at the time the violation occurred, *id.*; and (3) determine whether the plaintiff established state liability for a state-created danger, *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). Because I believe the majority reads *Kallstrom* too narrowly, thereby answering the first question wrongly and ignoring the remaining questions, I respectfully dissent from Part III of the majority's opinion.

### I.

#### A.      Constitutional Violation

The majority contends that the constitutional right at issue here is somehow different from the constitutional right at issue in *Kallstrom*. *Kallstrom* involved the release of three undercover police officers' personal information—including their names, addresses, phone numbers, social security numbers, and family members' names—to the attorney of several members of the violent "Short North Posse." *Id.* at 1059. The *Kallstrom* Court held that the City's improper release of such sensitive personal information rose to constitutional dimensions, implicating the substantive due process component of the Fourteenth Amendment, because the disclosure of the officers' personal information "created a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives." *Id.* at 1063–64. I am not persuaded by the majority's conclusion that the right at issue in this case is in any way different than the right at issue in *Kallstrom.*

Here, the Defendants improperly disclosed several corrections officers' names, birth dates, and social security numbers to an inmate population that otherwise would not have had access to such confidential information. Armed with this information, inmates wreaked havoc on the officers' lives by using the officers' social security numbers to obtain other confidential information, including each officer's home address and family members' names. Specifically, inmates have made numerous death threats against the officers and their families, referencing the officers' home addresses, social security numbers, and family members by name. In a substantial step towards making good on these threats, inmates have sent confederates on the outside to the officers' homes. Evidence of this includes prison officials intercepting incoming prison mail containing photos of Melissa Barber's house and car, and, most frighteningly, inmates accurately describing the officers' children in taunts. Because I believe it is clear that the disclosure of the corrections officers' personal information "created a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives," *id.* at 1063–64, it is difficult to see how this case does not involve a violation of the same constitutional right that we described in *Kallstrom.* Indeed, Judge Cook's concurrence implicitly suggests as much. *See* Cook Op. at 9 ("[I]t is worth rethinking *Kallstrom*.").

The majority unhappily acknowledges that *Kallstrom* created a privacy right protecting an individual's sensitive personal information—one it describes as "narrowly tailored" and "limited to circumstances where [1] the information disclosed was particularly sensitive and [2] the persons to whom it was disclosed were particularly dangerous *vis-a-vis the plaintiffs*." Maj. Op. at 7. The majority is careful to point out, however, that this right "is virtually unique among courts of

appeals." *Id*. at 6. Of course, what our sister circuits have done is irrelevant as *this* Circuit has clearly recognized the right; indeed, we are bound by the prior panel's opinion in *Kallstrom*. *See, e.g.*, *Dingle v. Bioport Corp*., 388 F.3d 209, 215 (6th Cir. 2004) ("A panel of this Court cannot overrule the decision of another panel."). In attempting to distinguish *Kallstrom*, the majority explains that social security numbers are not sensitive enough, nor were the inmates dangerous enough. I disagree on both points.

1.          *Personal Information*

The majority concludes that social security numbers are not "tantamount to the sensitive information disclosed in *Kallstrom*." Maj. Op. at 7. The majority highlights the fact that in *Kallstrom* "[t]he district court did not make any explicit findings with respect to whether disclosure of . . . *social security numbers* . . . put the officers at substantial risk of serious bodily harm[,]" and therefore a remand was necessary for the district court to "consider the extent to which the release of this information jeopardized the officers' personal security, and whether the threat, if any, implicated the officers' constitutionally protected interests in privacy and bodily integrity." *Id*. at 6 (quoting *Kallstrom*, 136 F.3d at 1063 n.2). Inexplicably, however, the majority holds that social security numbers today are not sufficiently sensitive as a matter of law. Adherence to *Kallstrom* would seem to require a remand on this point.

In any event, in the nearly ten years since *Kallstrom* was decided, with the growth of the internet and ubiquitous online databases, social security numbers have become, if anything, more sensitive. *See generally, e.g.*, Lynn M. LoPucki, Human Identification Theory and the Identity Theft Problem, 80 Tex. L. Rev. 89 (2001). Indeed, armed with a social security number and an internet connection, anyone can obtain an individual's credit report, which, at a minimum, contains the individual's name, address, phone number, birth date, employer, and spouse's name, in addition to credit information and public-record information. *See, e.g.*, Federal Trade Commission: Building a Better Credit Report, http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre03.shtm (last visited July 30, 2007). This is materially indistinguishable from the information we deemed to be sufficiently sensitive in *Kallstrom*. *See Kallstrom*, 136 F.3d at 1069–70 ("We hold that because disclosure of the officers' addresses, phone numbers, and driver's licenses, as well as the names, addresses, and phone numbers of their family members, placed the officers and their families at substantial risk of serious bodily harm, the prior release of this information encroached upon their fundamental rights to privacy and personal security under the Due Process Clause of the Fourteenth Amendment.").

Therefore, given that today a social security number is a veritable key to an individual's most sensitive personal information, I am unpersuaded by the majority's analysis that social security numbers are less sensitive than the information disclosed in *Kallstrom*, and the majority's implicit conclusion that, in the almost ten years since we decided *Kallstrom*, social security numbers have become *less sensitive* such that a remand on this point is no longer warranted.

2.          *Relationship Between Inmates and Corrections Officers*

The majority concludes that the threat of retaliation from the inmates was not apparent. That is, the relationship here between the inmates and the corrections officers "is not defined by the clear animosity apparent in *Kallstrom*." Maj. Op. at 7. Ignoring the benefit of hindsight (which confirms that the informationally empowered inmates did in fact retaliate against the officers and their families, substantially putting them at risk), the relationship here between the corrections officers and inmates, particularly those housed at a Level VI "Super Max" facility, is certainly characterized by animosity. Indeed, in Michigan, Level VI facilities are reserved only for prisoners with substantial behavioral problems who cannot be safely housed at other facilities. *Cain v. Mich. Dept. of Corr.*, 548 N.W.2d 210, 212 n.4 (Mich. 1996); *see also, e.g., Anthony v. Gilman*, No. 4:03-CV-87,

2006 WL 222842, at *1 (W.D. Mich. Jan. 26, 2006) ("IMAX [is] known as a 'Level 6' facility, or 'Supermax,' meaning that it house[s] the worst of the worst offenders in terms of security.").

I cannot conclude that the threat of retaliation was any less severe here than in *Kallstrom*. Clashes between inmates and guards are nothing new. *See, e.g.*, *Morgan v. Ward,* 699 F. Supp. 1025, 1055 (N.D.N.Y. 1988) ("The realities of a maximum facility correctional institution are far removed from the peace of a judge's chambers, and the court is fully aware that the exchange of verbal insults between inmates and guards is a constant, daily ritual observed in this nation's prisons." (citation and quotation marks omitted)). Corrections officers must be ever vigilant of constant, and often innovative, threats to their safety, ranging from verbal assaults to excrement bombs to stabbings. *See, e.g.*, *Rust v. Grammer*, 858 F.2d 411, 412 (8th Cir. 1988) ("For several months, inmates had been setting fires and throwing food, urine, and feces into the gallery and onto the guards."); *Bruscino v. Carlson*, 854 F.2d 162, 165 (7th Cir. 1988) ("Inmates have attacked other inmates and guards with a homemade bomb, with a light bulb, with a padlock, with a sharpened pencil wielded as a knife, with a sharpened toothbrush, with feces, with a chair, with a mop wringer, with a home-made mallet, and with a bucket of boiling water, as well as with the usual zip guns and shanks."). It does not take much to imagine what inmates housed at a maximum-security facility would do when handed the social security numbers of the corrections officers who guard them. They would do exactly what they did here—"create[] a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives." *Kallstrom*, 136 F.3d at 1063. Indeed, the Defendants concede that social security numbers are exactly the sort of information that should never have been disclosed to the inmates. I cannot join the majority's holding that the adversarial relationship here between the corrections officers and the inmates was not sufficiently analogous to the animosity apparent in *Kallstrom*.

*          *          *

Because the facts of this case are substantially identical to *Kallstrom*, and because I believe the majority has unpersuasively distinguished *Kallstrom*, I would hold that the improper release of the corrections officers' sensitive personal information "encroached upon their fundamental rights to privacy and personal security under the Due Process Clause of the Fourteenth Amendment," where its disclosure "placed the officers and their families at substantial risk of serious bodily harm."*Id*. at 1069–70. Moreover, the Defendants have not put forward, and I cannot fathom, a legitimate state interest in disclosing this personal information to the inmates. *See id*. at 1070; *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (1998). Accordingly, I now answer the remaining two questions, which the majority found unnecessary to address.

**B.          Clearly Established Right**

I have little trouble concluding that the constitutional right here was clearly established. "In order to conclude that the right [that] the official allegedly violated is 'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[Q]ualified immunity is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Id*. at 646 (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). Given the striking similarity between the facts of this case and the facts in *Kallstrom*, "in light of pre-existing law the unlawfulness [would have been] apparent." *Id*. Indeed, we held the very action in question here unlawful in *Kallstrom*. That is, a reasonable state official would have been aware that releasing corrections officers' personal information—i.e., names, birth dates, and social security numbers—to inmates at a Level VI, "Super Max" facility could result in the deprivation of the officers' due process rights to personal security and bodily integrity. *Kallstrom*,136 F.3d at 1067; *cf. Bloch v. Ribar*, 156 F.3d 673, 687 (6th Cir. 1998) ("In light of our ruling in the present case, however, public officials in this circuit will now be on notice that such

a privacy right exists. Therefore, any future violation will not allow an official . . . to claim the lack of reasonable notice that is necessary to sustain a defense of qualified immunity.").

## C.     State-Created Danger

To bring a state-created-danger claim, the individual must show: "(1) an affirmative act by the state [that] either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (citing *Kallstrom*, 136 F.3d at 1066). As we have stated repeatedly, "state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way." *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989)). In other words, the issue is whether the state officials did anything "affirmative" to "embolden" the person causing harm to another. *Jones v. Reynolds*, 438 F.3d 685, 703 (6th Cir. 2006).

### 1.     *Affirmative Act*

"Liability under the state-created-danger theory is predicated upon affirmative acts by the state [that] either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom*, 136 F.3d at 1066. Because it is often difficult to distinguish action from inaction, "[r]ather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or not, we have focused on 'whether [the victim] was safer before the state action than he was after it.'" *Koulta v. Merciez*, 477 F.3d 442, 445–46 (6th Cir. 2007) (quoting *Cartwright*, 336 F.3d at 493).

There is little doubt that Lowery's release of the corrections officers' personal information substantially increased the officers' and their families' vulnerability to private acts of vengeance. As in *Kallstrom*, "if [Lowery] had not acted, then the attackers would not have access to this information and attacks would not be facilitated." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 466 (6th Cir. 2006) (citing *Kallstrom*, 136 F.3d at 1067).

On the other hand, Sibert's role in the release of the corrections officers' personal information was limited to preparing the Internal Affairs investigative report that contained the corrections officers' personal information, which Lowery ultimately released. Sibert simply investigated the prisoners' charges and compiled a report for internal consumption. He played no role in determining what information would be released to the prisoners, or whether the report should be released at all. The corrections officers were no less safe after Sibert acted than before. It was Lowery's imprudent release of this report that created the danger.

Because Sibert did not act affirmatively to create or increase the risk that the corrections officers' would be exposed to private acts of violence, summary judgment in favor of Sibert was appropriate. The analysis therefore proceeds addressing only Lowery.

### 2.     *Special Danger*

To establish a "special danger," the Plaintiffs must show that "the state's actions placed the victim specifically at risk, as distinguished from a risk that affects the public at large." *Jones*, 438 F.3d at 690 (citing *Kallstrom,* 136 F.3d at 1066). The Plaintiffs have no difficulty demonstrating a special danger. As in *Kallstrom*, Lowery's release of the corrections officers' personal information "placed the personal safety of the officers and their family members, as distinguished from the public at large, in serious jeopardy." *Kallstrom*, 136 F.3d at 1067.

3.        *State Culpability*

Finally, the Plaintiffs "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *Ewolski*, 287 F.3d at 510. The state's conduct must be "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense,'" but the standard is "'no calibrated yard stick.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). In situations where, as here, there is an opportunity for the state officer to reflect and to deliberate before acting, deliberate indifference is the appropriate standard. *McQueen*, 433 F.3d at 469. "We have equated deliberate indifference with subjective recklessness, which means that the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citations and quotation marks omitted). Subjective recklessness can "be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) (citing *Ewolski*, 287 F.3d at 513 n.7).

It is a close call whether Lowery acted with the requisite culpability when he released the unredacted Internal Affairs investigative report to the inmates. Viewing the evidence in the light most favorable to the nonmoving party, however, as we must when reviewing a summary judgment motion, *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 902 (6th Cir. 2007), I believe factual issues exist concerning whether the risk was so obvious that Lowery had to have known about it.

Specifically, issues remain as to Lowery's level of recklessness. In an affidavit, Lowery claimed that he was unaware of corrections officers' information appearing in the report, and that he would not have released it to the inmates had he known. In deposition testimony, however, Lowery admitted to reviewing *every* page of the report before its release. Accordingly, Lowery's failure to notice a single corrections officer's personal information, which appeared on multiple pages of the report, seems suspect. Indeed, one corrections officer's personal information—including his name, birth date, and social security number—appeared *on the very same page,* prominently set apart from the paragraphs of text, as a prison informant's information that Lowery did redact.

Accordingly, I believe that this matter should proceed to a jury to resolve whether Lowery's awareness of the personal information contained within the report and his failure to redact that information amounted to deliberate indifference and not mere negligence.

## II.

Because the facts here are materially indistinguishable from *Kallstrom*, I respectfully dissent from Part III of the majority's opinion. Given the striking similarities between *Kallstrom* and the instant case, I have little trouble concluding that the corrections officers' constitutional rights were violated and that such rights were clearly established. As for the Plaintiffs' state-created-danger claim, I would **REVERSE** the district court's grant of summary judgment in favor of Lowery and **REMAND** for further proceedings on whether Lowery acted with deliberate indifference.