## BOWLES v. MARX HIDE & TALLOW CO.
### No. 10060.

Circuit Court of Appeals. Sixth Circuit.

Feb. 6, 1946.

Nathan Siegel, of Washington, D. C. (George Moncharsh, David London, and Nathan Siegel, all of Washington, D. C., Samuel J. Weiner, of Cleveland, Ohio, and Fritz Krueger and Homer B. Parrent, both of Louisville, Ky., on the brief), for appellant.

Lawrence S. Leopold, of Louisville, Ky. (Lawrence S. Leopold, of Louisville, Ky., on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and PICARD, District Judge.

HICKS, Circuit Judge.

The question before the District Court was one of fact. It was, whether appellee, a hide broker, purchased or sold hides of cows, steers and bulls in lots of less than 20,000 pounds. If it did, and received a commission therefor, it violated paragraph 1314.4 of Revised Price Schedule No. 9 of the Office of Price Administration, printed in the margin [1] and was liable in damages to the Administrator, in a sum three times the amount of the unlawful commission charged in each transaction. 50 U.S.C.A. Appendix, § 925(e). The District Court found that in all instances, save two, of those listed in Exhibit A to the complaint, appellee had made purchases in excess of 20,000 pounds. In those two instances it gave judgment for $9.09 and $6.36 respectively and these judgments are not in controversy here.

The Price Administrator appealed and asserts here that there is no support for the finding that the purchases from the packers by appellee as a broker were in each instance for a lot of hides in excess of 20,000 pounds entitling it to receive a commission of 3% on the sales under Sec. 1314.4. We think that this contention is contrary to the "indisputable character of the evidence." Tracy v. Com'r, 6 Cir., 53 F.2d 575, 579.

Laying to one side, for the present, another contention of appellant, we consider first whether Sec. 1314.4 was violated, since that was the only violation charged in the complaint. Appellee was broker for two tanners in the purchase of hides from a number of smaller meat packers. Since, even before the war, there was strong competition among the tanners for hides, the smaller packers had been accustomed to

---

[1] "In no case may any person charge or receive such a commission or fee on hides * * * sold for his own account even though such person may have performed the receiving service or any other service for the buyer, and in no case may any person charge or receive, pay or offer to pay such a commission or fee on hides * * * purchased or sold in the green or partially cured state or on hides * * * purchased or sold in lots of less than 20,000 pounds of hides * * *." 7 Federal Register 5707.

require that their entire monthly production be purchased in one lot, even though it contained bull hides, which many tanners were not equipped to use. In the transactions involving the fifteen alleged violations listed in Exhibit A, apart from those two in which violation was admitted, the testimony shows that the aggregate purchase of all hides from the packers, including bulls, exceeded 20,000 pounds.

But the purchasing tanners could not use the bull hides, so appellee arranged to deliver them to other or secondary purchasers, who could use them. In fourteen instances, listed in Exhibit A, the split deliveries of bull hides to the secondary purchasers were in amounts of less than 20,000 pounds and the District Court so found in its Finding 9. In the fifteenth transaction, seventh on the list in Exhibit A, the delivery of cattle hides to the primary purchaser, after the bulls had been taken out, was less than 20,000 pounds.

Appellee contends that in each transaction there was only one purchase, that of the entire monthly output of the packer by the primary purchaser, who agreed to take the whole lot and assumed responsibility for the entire purchase, including the commissions thereon to appellee. It contends that the arrangement to deliver the bulls directly to a tanner who could use them was an accommodation to the primary purchaser, and saved useless shipping to the primary purchaser and thence to the secondary purchaser.

The Price Administrator points out that the secondary purchaser paid the broker the proportion of the commission represented by the bulls to the entire purchase and that the books of the primary purchaser disclosed no liability to the broker for commissions on the bulls; and that the entire transaction indicates that the sales to the secondary purchasers were independent sales, and violative of the regulations, since they were for amounts less than 20,000 pounds.

In a colloquy with the District Court, counsel for the Price Administrator substantially conceded that the question, whether all three kinds of hides (cows, steers and bulls) were sold to the first tanner on his account, with disposal of the bulls to a second tanner as a matter of accommodation, or whether the cows and steers were sold to the first tanner and the bulls to another in an unrelated transaction, was one of fact.

If the evidence supports the finding of the District Court, that each purchase by the broker from the packer was for a lot of hides in excess of 20,000 pounds, then appellee is entitled to an affirmance of the judgment.

Isaac M. Bernstein, a hide buyer for Monarch Leather Company, one of the primary purchasers, testified as to a purchase from the Milner Provision Company, on November 24, 1942, that there were 18,405 pounds of cattle and steer hides which Monarch took, and 11,488 pounds of bull hides which Marx (appellee) agreed to sell to them. He testified that Monarch was obligated to take all of the given output of the packer and was responsible to Marx for the 11,488 pounds of bulls. He testified that in other transactions of purchase Monarch was likewise obligated to Marx for the bulls and that by using that method of disposal of the bulls directly to the secondary tanner freight and manpower could be saved, since it did not involve reshipping. He testified that competition was very keen for hides and that it would have been impossible to have bought the output of the smaller packing plants unless they took everything that was offered.

Bernstein testified on cross-examination that Monarch was not interested in the bull hides as long as Marx sold them and that he only purchased bulls when it was necessary to take them along with other hides. In response to the specific question as to the bull hides, "But Monarch actually didn't purchase any of these hides, did they?" he answered, *"Of course they did."* (Italics ours.) He further testified that they purchased them all and some of them they paid for and some they didn't, but that they paid no commissions and made no expenditures for any hides other than those shipped to them. As to a November 25th transaction, he testified that he received confirmation only of cows and steers, *"on the understanding that the bulls were sold to my account to somebody else."* (Italics ours.)

■ The Administrator introduced Bernstein as his own witness, and under familiar rules of evidence, vouches for his credibility.

The same rule applies to the testimony of Sol. W. Marx, likewise introduced as

a witness by the Administrator. Marx was secretary and treasurer of appellee. He testified: "When this situation arose, the Monarch Leather Company and the Abert Trostel & Sons Company, knowing that they had to purchase these bulls along with the cows and steers, * * * knowing that I was a broker and was in touch with all various sources or outlets for hides and knew what all the various tanners were using, they asked me if I would for their account dispose of all the bull hides. * * * And we talked this situation over * * * and I told them that naturally these bull hides could be disposed of for their account, that we could—if there was any loss on them in the sale of the bulls for their account, that they were responsible for it, and they were perfectly willing to assume that responsibility. * * *"

Asked on cross-examination if appellee had any written agreement with the primary tanners to resell the bulls for their account, Marx answered, "No, we discussed it. I was there many, many times and we discussed it and it occurred month after month." Asked by the Administrator if he had a letter from the tanners prior to the suit, telling his company to buy all the hides and dispose of those which could not be used, Marx testified: " * * * I had been in business a long time and in my relationship with tanners we find them very honorable men and in a matter that is as inconsequential as the reshipment of bull hides, as I call on them, and I see them two and three times every month, we discuss it verbally that they wanted these bull hides resold for their account; and it was such a logical and reasonable thing to do, it never occurred to us to reduce that to writing. That was just a part of a service that we were rendering as brokers to them in carrying out their wishes."

Everett Smith, treasurer and hide buyer for Albert Trostel & Sons, the other primary purchaser, testified: "In our purchases of the production of the plants, it was necessary to purchase the entire production. * * * We took what we wanted for our own use, the cows and steers and Mr. Marx was instructed to sell the bulls for our account. They were our property and our responsibility. If there had been any loss on the bulls, it would have been charged to our account. * * *"

He testified the bulls were not billed to them (in Milwaukee) because the easiest place to sell them was probably the Moser Tanning Company in Louisville, Kentucky (where appellee was located) and billing the bull hides and sending them to Milwaukee would involve extra handling and re-billing and shipping. He testified that his company was obligated to see that the commission was paid on the bull hides, but the payment of the commission thereon by another relieved them of bookkeeping entries. This same understanding of the transaction was incorporated in a letter written on November 1, 1943, by Trostel to appellee.

Asked, "Was there any written contract between you and the Marx Hide & Tallow Company relative to the purchase of the output of these packing plants?" he replied, "No there was none; but I saw Mr. Marx at least once a month, and in addition, I talked to him on the telephone." "Q. Was there any necessity of a written memorandum of your arrangement? A. We didn't feel so."

■ After considering all the evidence, we conclude that appellant has not made out his case. The testimony of the above three witnesses is explicit that the entire production of the packers was purchased by appellee for the "primary" tanners in the instances indicated, that these tanners considered themselves liable for the commissions on the several purchases and for any deficits which might arise in the disposition of the bulls. That there were no written agreements is evidence of the trust and confidence which had grown up between the parties through years of dealing together. The evidence clearly proves that the commissions were charged only on the purchases which, in all but the two cases we have noted, were in excess of 20,000 pounds and that no commissions were charged on the distributions of the bull hides in lots of less than 20,000 pounds, on behalf of the primary purchasers. We agree with the District Judge that there was no violation of Sec. 1314.4.

On the appeal, appellant by brief and argument before us, asserted that on the facts appellee violated Sec. 1314.1 of RPS No. 9, by charging a commission on sales and deliveries by one tanner to another of hides in lots of more or less than 20,000 pounds in that the seller (primary purchaser) had not actually paid the commission, but merely agreed to pay if the secondary purchaser, also a tanner, did not.

■ We cannot consider whether appellee was guilty of a violation of Sec. 1314.1.

Appellee was not charged with a violation of that section either in the complaint or any amendment thereto. Appellant, on appeal, cannot change the theory of his case made by his pleadings and his conduct of the case. See United States v. Winkle Terra Cotta, 8 Cir., 110 F.2d 919, 921.

Affirmed.